[Civ. No. 16596. Second Dist., Div. Three. Mar. 10, 1949.]

JESSIE NORTHRUP, Respondent, v. SECURITY TITLE INSURANCE AND GUARANTEE COMPANY (a Corporation) et al., Appellants.

Milo V. Olson and F. D. R. Moote for Appellants.

Maurice Gordon for Respondent.

SHINN, P. J.—Lincoln A. Freeman and Molly Luke Freeman, husband and wife, appeal from a judgment in favor of plaintiff, Jessie Northrup, declaring plaintiff to be the owner of certain real property and quieting her title against the claims of appellants Freeman under a promissory note held by Lincoln A. Freeman and a trust deed on said real property securing the same. Plaintiff acquired title by execution sale

of the right, title and interest of John and Susan Wight, former owners.

The note for $3,500 which was to be repaid in four months, and the trust deed were dated June 24, 1939. On August 2, 1939, they were transferred to George Pepperdine as security for certain monies to be advanced to John Wight and Lincoln A. Freeman, for use in the development of oil leases in Montana. Pepperdine later transferred them to Consolidated Petroleum Company, which in turn delivered them up, endorsed in blank. Later, Lincoln A. Freeman was named in the assignment as the assignee and he proceeded to take steps for a sale of the property under the trust deed. The court found that the note and trust deed were given by Wight and his wife to Mrs. Freeman without consideration and for the sole purpose of using the same as security for the Pepperdine loan. It was also found that they had been "delivered up" by the holder to John Wight and in truth and in fact were owned by him.

Mr. Freeman testified that he met Wight some time in 1937 and loaned him $300 to help him retain some oil leases; he had borrowed this money from his father, this being his only source of income. From a memorandum book he read items totaling $1,063 as loans to Wight in 1938, part of it his money and the rest of it borrowed from his father, his sister, or from friends. The notations, however, were not made at the time of the supposed transactions. The evidence was that the account was made up as late as 1942. These loans, Freeman testified, were personal loans, not in connection with any business. In June, 1939, he was interested with Wight in an oil venture in Montana; his wife gave him $500 and he loaned it to Wight in cash; on January 10, 1940, his wife loaned Wight an additional $750 in cash; in the following month he loaned Wight $410 which he had received from his father, but this, he testified, might have been given to Wight to pay some of the expenses of their oil venture. He also testified that at the time the $750 was advanced in January 1940 he and his wife understood that the note and trust deed were then held by Mr. Pepperdine but would be returned to Wight after Pepperdine was paid off and would be given to them to secure all monies previously loaned; that he had had a written agreement to this effect, but he had not seen it for quite a long time—that he does not have the agreement; there was another agreement under which he was obligated to Pepperdine, but that he did not have it in his possession; he did not remember

whether there was an agreement between himself, his wife, and Mr. Wight, about August 2, 1939, which provided that he and his wife had no interest in the note and trust deed, but there may have been such an agreement. He also testified that negotiations with Pepperdine were undertaken several weeks before August 2d, when the agreement was made with Pepperdine and the note and trust deed were assigned, but he did not recall whether the discussion started before June 24, 1939; that they discussed with Pepperdine's agent trust deeds on Wight's San Diego property and the Whittier property (the property presently involved). Mrs. Freeman testified that she gave Wight $500 in cash in June, 1939, having at that time about $1,000 in cash in the house. She was given no receipt; she gave him $750 in addition in January, 1940. This was also in currency and she was given no receipt. She never advanced Wight any money by check, nor had she seen a receipt for any money advanced. Wight testified that he could not remember how much he borrowed from Freeman in 1937; that he had a faint recollection of $250 which he thinks was for living expenses; that he had no recollection of a $50 item in 1937; that all the money he got from Freeman was in cash; that he did not know whether he got any in 1938; that he had a faint recollection of items of $200 and $250 in that year; he did not recall the items testified to by Freeman; he had no understanding with Freeman that the money he borrowed in 1937 and 1938 would be secured, but that in 1939 the arrangement was that it would be secured, as well as additional sums to be advanced up to $3,500; there was no agreement as to when the balance would be advanced. He could not tell the dates or amounts when he received money from Freeman after the trust deed was executed; he had kept track of the monies he had borrowed from Freeman in a little book but no longer had the book. He testified that he received as a loan from Mr. Pepperdine some $18,000. He testified, ''I thought that he [Freeman] would take other security and that I more or less had the handling of that mortgage, or could handle it more or less as I wanted to until January, 1940 . . . $500 was all he paid me on that, as I understand it; he didn't pay me the balance and therefore I didn't consider that they were really owning that trust deed at that time.''

Plaintiff introduced in evidence a carbon copy of an agreement bearing date August 1, 1939, between Wight and Mr. Freeman, which recited that Freeman held the $3,500 note and trust deed on the Whittier property, that he was willing

to and would assign the same to George Pepperdine as security for loans, that Wight would repay or cause to be repaid the loans to be made by Pepperdine and that when the same were paid the deed of trust would be reassigned to Freeman. Under the word "witnesses" were two typed lines. Above the upper one was a yellow smear. Clark Sellers, leading authority on questioned documents, testified that the signature of Wight appearing on the agreement was written with a ball point pen, and that no ball point pens were manufactured and sold in the United States until 1945. He also testified that a name had been written on the upper signature line and had been removed by the application of liquid chemical; he had restored the writing and made a photographic enlargement showing the signature to be "L. F. Almonson." Lucille Almonson, called as a witness, identified the signature on the photographic enlargement as her own, but had no recollection of signing the document. She testified that she had been employed in the office of the attorney for Wight, but not prior to 1945.

Much evidence was introduced respecting the business transactions between Wight and Freeman which extended back to June, 1939, when they entered into an agreement by which Freeman agreed to buy from Wight certain government oil and gas leases and equipment in Montana for the sum of $350,-000. The testimony given at the trial approaches 600 pages. We have given a summary of it which is sufficient for the purpose of our decision.

■ The circumstantial evidence strongly supports the finding that the note and trust deed were given to Mrs. Freeman for the sole purpose of their being used as collateral security for loans to be made by George Pepperdine for the joint benefit of Wight and Freeman. The testimony of Wight and Freeman, which they depended upon to support their claim that the note and trust deed were given to Mrs. Freeman as security for moneys that had been advanced and were to be advanced in the future, was vague and contradictory. It is altogether probable that Mr. and Mrs. Freeman advanced money to Wight from time to time, either for his personal use or to assist him in his oil ventures, but the evidence furnished good reason for doubting that the trust deed was given as security for the loans. Plaintiff acquired title under the execution sale November 5, 1945. Consolidated Petroleum Company assigned the note to Lincoln A. Freeman September 20, 1946. The contention of Wight and the Freemans that this reassignment was made pursuant to an agreement entered into when the note

and trust deed were given was greatly weakened by the fabrication of the written agreement which admitted ownership of the note and trust deed by Freeman and provided for its return to him after the Pepperdine debts were paid, which agreement, although bearing date of August 1, 1939, obviously was not prepared or executed until some time in 1945. This belated attempt to impose a trust deed lien upon the property superior to plaintiff's title acquired at the execution sale failed because the court did not believe the testimony of the defendants. The credibility of the witnesses was for the trial court. (*Davis* v. *Judson,* 159 Cal. 121, 128 [113 P. 147]; 27 Cal.Jur. § 156, p. 184; 8 A.L.R. 796.) The testimony of Wight and Freeman was contradictory and in material respects disproved. The contention that the court should have believed it and given full effect to it in deciding the factual issues, does not present a question of law on the appeal.

Upon the oral argument counsel recently employed by appellants advanced a new theory of defense. It was argued that because plaintiff purchased the property at execution sale she was precluded from questioning the validity of the Freeman trust deed and that since these facts were alleged in the complaint no cause of action was stated. We are not satisfied that this alleged defense presents a pure question of law. It should have been presented to the trial court. No reason has been advanced why the issue was not raised at the trial, nor is any excuse offered for the failure to raise the point in the opening brief. Under these circumstances we do not feel called upon to consider them. (See cases cited in *Beadle* v. *Northrup, ante,* p. 510 [203 P.2d 552] this day decided.)

The judgment is affirmed.

Wood, J., and Vallée, J., concurred.

A petition for a rehearing was denied April 6, 1949, and appellants' petition for a hearing by the Supreme Court was denied May 5, 1949.